Page 16, Section 1, Page 6 Tom Harper et al. and the Oversight Committee et al. 15 minutes be shared by the Attellant, 15 minutes be shared by the Attollees. Mr. Spaulding and Mr. Caput, please. Good morning. Good morning, Your Honor. My name is Corey Spaulding, and it's my privilege today to be here to represent the appellants, Conco Acquirements, LLC, and Delfasco, LLC. With me at counsel table are my co-counsel, Gilbert Backenroth, and then Mr. David Kaplan, who represents the individual named appellants, who are the ESOP shareholders in this case. May it please the court, this is a case that at bottom is about the bankruptcy code and the application of the bankruptcy code to a plan of reorganization. It's also, however, about a case about plain text interpretation within the creature that the code has created that we know as the plan of reorganization. So two things are really key, we believe, to this appeal. First is what the code requires, and second is what the plan of reorganization says. Here, the bankruptcy court's decision below conflicts with key provisions of the bankruptcy code, and we believe ignores the plain language of the plan of reorganization that's at issue. Therefore, we would ask this court to reverse the decision of the bankruptcy court. Wouldn't you say in the plain language, wouldn't you say the plan is silent about this point? Absolutely not, Your Honor. Okay. Section 1123A1 of the code says, notwithstanding any otherwise applicable non-bankruptcy law, a plan shall specify treatment of any class of claims or interests that is impaired under the plan. So according to the code, the plan has to specify, it has to say, not only are you impaired, but tell you how you're impaired. But that just takes you back to the underlying question. I don't understand how that tells you whether the plan is silent or not. I'm just trying to make the point. You said plain language, and I guess I would have said to both of you, I don't see the plan having plain language telling me what to do on this. Do you disagree with that? I don't disagree with that, Your Honor. And then on the impaired point, I find that to be question-begging. Because you have been notified about this if the plan tells you about it, and you haven't if the plan doesn't tell you about it, in which case, who cares because you can do it anyway. So that's why I find that not super helpful to me. Right, Your Honor. My response would be, however, that what we're talking about here is a fundamental right of alienation. And that under the Bankruptcy Code, if you as an equity holder are going to be impaired, the Bankruptcy Code says that first in a disclosure statement, under 1125, it needs to be clear to you what the precise impairment would be. And then under the plan itself, it needs to be precise. But if the plan just clarified it, it would be harmless error that it wasn't in the disclosure statement. Don't you agree with me? You wouldn't nullify it if the plan contemplated you could do the sale, right? I'm just trying to isolate what really matters, and I'm just not sure the impairment point really matters. I know it matters, and I agree it matters as a backdrop. The presumption is you can alienate freely because that can potentially help everybody. But it still takes you back to what the plan says. Correct, Your Honor, and that's where I was planning to go and will go. I just wanted to give the umbrella that we believe the plan has to be read in the context of 1123, which says if the plan doesn't specifically tell you how you're impaired, you can't be impaired. But if we look to the plan, the first provision in the plan that we believe is important, and we believe codifies 1123 within the plan, is a statement that says on page 1, all creditors and equity security holders should refer to Articles 4 through 5 of this plan for information regarding the precise treatment of their claim or interest. And so here, we would argue it goes even a step beyond the statute and replaces the word specific with precise. So it tells us we need to go to Articles 4 and Articles 5, read those articles, and determine how precisely we may be impaired. And by we in this case— Out of curiosity, just to make sure I'm getting this, this is a bankruptcy question, which I'm just not sure I grasp. So you have the plan. Bankruptcy court approves the plan. Would the bankruptcy court still have a role? Let's say you're right, that theoretically this alienation was contemplated. I'm assuming the bankruptcy court would still have a role to play in deciding whether this was an appropriate sale from the perspective of the debtor's long-term interest, the creditor's long-term interest, and other considerations in the code and plan. Am I right about that? I don't think so, at least not in the first instance, Your Honor. First, I think it's important to say there's no specific— Let me just ask the question a little differently. What if the bankruptcy court thought this sale destroys the effectiveness of the plan? There wouldn't be a way to stop the sale? Well, Your Honor, I think that we could come up with a set of facts where it would be entirely appropriate for the bankruptcy court to get involved. So here's where— Are you talking pre-confirmation? Post-confirmation. Post-confirmation. The plan is confirmed. All right. Because what I'm trying to figure out is what seems to me the message of the bankruptcy court and district court decisions is they weren't going to let this happen, whether it's because the confirmation plan by its terms prohibited it or because they think it underserved the interests of the relevant entities in the bankruptcy. And so I just find myself saying, why do I have to worry about this? Because there's no way they were going to let you do it. Well, Your Honor, I think that the courts below— And they wanted to do this fast so it wouldn't chew up more attorneys' fees. That, I think, was the other thing driving this. Well, first, Your Honor, we've addressed the attorneys' fees in our brief and shown that they're not as high as they've been claimed, but that's not Your Honor's point. To Your Honor's point, we believe the courts below conflated two items. They conflated the plain text analysis of whether or not the right of alienation is impaired, which is a general question where we would look to the language, see if it's ambiguous. If it's not ambiguous and we believe that it's not ambiguous, then you would give it its plain reading. However, what we believe they've done is they've gone back to the pre-confirmation period. They've looked at a sale that was contemplated, a specific sale, at that point in time of assets, not of equity, which is what we're talking about now. And they've extrapolated out a potential parade of horribles that could result from a sale that was contemplated several years ago but may not be the offer of sale that's made tomorrow. And so if tomorrow an offer of sale were made or a purchase were made by my client, Delfasco, or anybody else, the first instance would be for the independent trustee to take a look at that sale. Which is very expensive and time-consuming and going to drain the – I mean, the hope is to let this Chapter 11 become a successful reorganization. Well, Your Honor, I guess my client is just as entitled to the plain text analysis of the plan as everybody else. This isn't just a contract between the creditor and the debtor. It's a contract. Do you challenge their assumption that the Army Department would cancel the sales – cancel this particular purchasing arrangement if you guys bought them? Well, Your Honor, I don't know that the record is current on that issue, but let me answer with what I think we can glean from the record. The Department of the Army chose not to participate in this proceeding. So they clearly, through that action at least, have said that they don't have an issue to be heard in front of this court on appeal. Second, the issue again that was considered pre-confirmation was a sale of assets. It wasn't a sale of equity interests. If someone purchases the equity, they're required to comply by the plan. There's a binding provision in Section 203 that says if somebody steps in your shoes as a successor, they have to comply with the plan. What does that mean if the Army cancels the contract? Well, Your Honor, there's no basis to believe that the Army would cancel the contract. Well, isn't – there are also some hints in the record that DelFasco was interested in this company so that they could shut it down and would no longer have competition? Your Honor, there's no factual basis for that in the record other than the other side has stated it and the bankruptcy court has repeated it. Tell us why your client wants to buy it. Your Honor, my client wants to buy it because it is a company that has similar synergies. They would evaluate when they came into the company how they would run the company. I can't tell you today how it would or wouldn't happen because the offer of proposal may be intertwined in that. In fact, the last offer that was made by DelFasco was to keep the company operational. Well, I mean, you can resolve one record issue by just saying DelFasco would not shut the company down. That's not their plan and that's not what they were going to do. Well, Your Honor, I can't in good faith answer one way or the other because I don't know what ultimately would happen. But again, the last offer that was made by DelFasco was to keep the company operational through 2018. They would purchase the equity shares, but they were going to pledge to continue to maintain the company, which goes back to my broader point, which is that we can't, I don't believe, analyze the legal question of what is or isn't permissible under the plan with a series of hypotheticals about what an offer may or may not be. Just because a sale of purchase offer is made doesn't mean that it will be accepted. And if it is accepted and the company were sold and my client or anyone else who purchased it violated the plan, they would be subject to a breach of contract or some other type of action. But at base, Your Honor, the question that's been asked here by the bankruptcy court, which is would a sale to DelFasco harm the company's chance of operations? Again, we don't believe this is the correct question. I'm running out of time, Your Honor. Mr. Kaplan's going to come up. But let me close for the moment on this. We would really ask the court to focus on Article V and the specific language that's addressed to the impairment. The key sentence, Sentence 1, which says, On the effective date, holders of equities, securities, and the debtor shall retain their interests as an existent immediately prior to the effective date. Well, their interests immediately prior would have included the right to sell. There would have been nothing that would have prohibited them the day before confirmation from selling their shares. And it's only in that second sentence when the idea of a prohibition on sale exists, and it's specified that only the debtor can't buy those shares and that the date assigned to that is December 31st, 2018. And so I'll wrap up for now unless the court has more questions, Your Honor. But we would ask you to really look and focus at the plain language. We think that the bankruptcy court has conflated those two sentences into one. We don't believe it's silent or ambiguous. We think it's very clear what alienation is prohibited here, and they've told us specifically what that is. Thank you. Good morning, and may it please the court. I represent the five ESOP participants. My time is limited, so I want to cut to the chase on a few of the questions that I heard asked, and I want to make sure we answer those questions. I believe you asked, Judge Sutton, isn't the plan utterly silent on this issue? The answer to that is an unequivocal no. The plan speaks loudly, and I mean loudly, about who the stock can be sold to and who it cannot be sold to. The plan clearly states that the debtor and now the company cannot purchase the stock from the ESOP. Conversely, that means the ESOP can't sell the stock to the debtor. There is no other prohibition on alienation in that provision. You can't read it in there. That's an implication. I would call that an implication. But the issue of silence, Your Honor, has to do with whether the topic is covered in the provision. Let's take an example of a situation where the court found that the plan was silent. In the Tarek's case, interest wasn't mentioned in the plan, but in that case the insurance companies were entitled to be paid in full in cash on the distribution date because payment was delayed for a very long period of time. They weren't receiving full value because of the time value of money. The court then used its equitable power to come in and say, okay, we need to provide interest to enforce the terms of the plan and make sure that these creditors are paid in full. There is no silence like that in this case. What we have here is the case like In re Wood, which is the dairy farmer case, where the farmer sold the dairy herd because it wasn't prohibited by the plan. And the creditor said, well, golly, how could the plan allow that because how are we going to be paid? The dairy herd has to exist for us to be paid because otherwise the thing won't be operational. And therefore drawing the inference, well, the plan must not permit that. That's what they're trying to do here, Your Honor. There is no prohibition on selling stock in that provision. And to your question, well, can't the court get involved if the provision destroys the plan? No, court can't get involved. You can vacate a plan for fraud under 1144, 180 days afterwards. In this case, Your Honor. You're saying they would have no recourse if there's an effort to sell and the bankruptcy court, the creditors and the debtor, think this is very much not in the interest of the players in the bankruptcy? They would not have a way to stop the sale? I don't believe so, Your Honor. There would be a breach of contract action. Your Honor. So what happens? What if they just reject the proposal? Here's what, if the trustee rejects the sale proposal? Yeah. Well, then nothing happens. The stock isn't sold. The independent trustee who we've got appointed wants to be able to take up purchase offers and fulfill his fiduciary duties to my clients. But I would have thought that you could – it's up to the trustee initially, and I would have thought interested parties could challenge that exercise of judgment. Well, they could say – In either direction. It wouldn't be a ripe controversy. They could say, well, once the plan has been accepted, well, this is going to – once the proposal has been accepted, there's going to be a breach of the plan. Remember, the plan provides for payment to creditors. It says they get their defined payments and they can get their contingent payments. There is no evidence of record whatsoever that the parade of horribles would occur, which is buy stock, cease operations, cease to pay. Delfesco steps into the shoes of the debtor. They have to pay under the plan. So the issue would only arise if the stock is sold and then there was a breach of the plan. Out of curiosity, can both of you, on behalf of your relevant clients, guarantee that those key functional components of the plan will be delivered upon with any proposed buy offer? Well, they're not actually key functional components you're referring to. That everyone gets paid off through the end of 18. Okay, that might matter. Yes, Your Honor. And that there's actually an equity interest in the debtor. Can you make those guarantees? Your Honor, the guarantee is that the contract must be performed. Whoever owns Conoco would be running Conoco, and those payments have to be made under the plan. Delfesco would step into the shoes of the ESOP trustee, would be the stockholder, controls the board of directors, and ultimately would be accountable. So the debtor, nothing changes. If the debtor's stock is acquired, the reorganized debtor, that entity must perform the plan. And if they didn't perform the plan and the creditors could allege in good faith that the plan had been violated because they're not getting what they bargained for, their money, which is really all this is about money, getting paid off in full, they would have a breach of contract claim against Conoco. So the answer is no one, you'll get a chance in rebuttal if you can guarantee that, I'd be interested if you could guarantee that. You mean guarantee that all payments will be made? Yeah, exactly. Well, with contracts there's never any guarantees, Your Honor. Yeah, no, no. But that's not the question. There's no evidence that that. Now, all I've heard is that the creditors will be able to sue Delfasco if they don't get paid. Well, let me tell you one more thing, Your Honor, is that you asked will the Department of Army cancel the contract. Actually, there's no evidence of record on that. General Dynamics stated in a pleading that they would not – they would object to the assignment of the contract to any affiliate of Delfasco. Now, what the bankruptcy court did is infer based on that that that will destroy the company. But, Your Honor, in the reply brief we cited record evidence, which they have not, which is that the General Dynamics contract runs out at the end of 2015. So the bankruptcy court approved a plan which involved payment to creditors through 2018, through the end of 2018, knowing that the General Dynamics contract was going to sunset at the end of 2015. So even though, you know, as you rightly say, there's no guarantee in the plan, but the court has gone through a feasibility determination considering all those factors prior to confirming the plan. So that's – that's the – Your Honor, I would answer it this way. If the court had determined that it was necessary for Conco to remain operational to perform the plan and that that further meant that the stock could not be sold because that would somehow affect operations, the provision would state clearly that no third party can purchase the securities rather than just simply saying that the debtor can't repurchase the securities. So I infer from what's in the plan, which is where we have to start and end our analysis unless it's ambiguous, I infer from that that that must not have been in anyone's minds as being necessary for the plan to be performed. Thank you. Okay. Thank you, Your Honor. Thank you. Good morning, Your Honors. Neil Bordy, appearing for Conco, Inc. May it please the Court, first I'd like to address just a couple factual issues that the appellants have provided throughout their briefing and today in their argument. The first is that they have continuously alleged in their briefs that I, as counsel for Conco, Inc., in answering a question from the district court in an action separate from this court in the federal court matter, that I stated that a sale to a third party other than Delfasco might be permitted. And I think it's important to look at that just briefly. The appellants have taken this out of context, Your Honors. Let's forget what you said before, but this was a question I wanted to ask anyway, so I don't care what you said before. Just tell me the answer. I guess I'd be really surprised that one would say as to this confirmation plan that there are no sales to outside parties. I mean, Warren Buffett swoops in and says I'll pay ten times earnings. You're really going to say, no, no, no, we can't do it? Where does it say that? It would be ludicrous not to accept that offer. Here's what would need to happen, okay? It is, as I said in answering the district court. I don't want to hear about the past. Answer my question. Warren Buffett comes in and is offering ten times whatever measly earnings, a hundred times. It's a ridiculously good offer. You're going to say we can't do it? No, but Warren Buffett's going to have to talk to the creditors, and if the creditors agree… Then you're going to have to amend the plan? Is that what you're going to say? No, the plan has been substantially consummated. Okay. We cannot go back and amend the plan. So you would agree that in that setting you could have a sale to a third party? Yes. There could be a sale under these circumstances. If Warren Buffett comes in and says, I'm going to pay everybody in full, and the creditors say great, the debtor says that's fine, our agreement with our plan, our contract with the creditors would be fulfilled, what would need to happen is that we, as the debtor, would have to file a new Chapter 11, and we would prepare a prepackaged Chapter 11 plan that everybody, the purchaser, the creditors… You're saying you would have to jump through those hoops because this plan doesn't allow it? That's correct. Once this plan is substantially consummated, this plan cannot… It is what it is. It is what it is. It is what it is. And what it is right now is it doesn't allow Del Fasco. Do you agree with me it's silent on this point or do you think it plainly supports you? It seems to me silent on third party sales. Am I right about – do you agree with that and that we now are in the game of inferences and implications? No, I don't, Your Honor. I believe that if you look at the four corners of the document, the plan, which encompasses the confirmation order, which encompasses the entire case. The bankruptcy court lived with this case before confirmation for two years. There were numerous hearings. There were numerous briefs filed. There were arguments from all parties. And if you go through the factors – and I've got to point out that when you're looking at a contract, the primary issue that you're looking at is the intent of the parties. Here you have the creditors and the debtor agreeing on the intent of this plan. And the intent of this plan was that there would be no sale until January 1 of 2019. So that's just – that's the primary issue that – What's your answer to this point of bankruptcy? Any role – let's just say the plan does contemplate third-party sales even until Delfasco. Is there a recourse for the debtor or the creditors to go back to the bankruptcy judge or file some action, protest the trustees' consideration of the offer to protect their interests? How does that work? In other words, is the case over? If they're right, is the case over? Technically, yes, Your Honor. Once the case is substantially consummated, if the plan had specific language that says that this can – Then they just make the offer and you guys, the trustee, decides whether to accept it. Correct. And you have – the creditors have no right and the debtor has no right to come in and say, please, you can't do this. Well, what happens in that instance, as the appellant stated, is that the appellants would step in the shoes of the debtor. And they would be under – they would be required – All right, well, then it's up to the creditors. But the creditors could protest, couldn't they? Couldn't they file an action saying this whole scheme is designed to prevent us from getting our last year and a half of payments? They could bring – yes, they could probably bring an action. I don't know whether it would be through bankruptcy court or in federal court. They could bring an action potentially saying that breach of contract action, saying that we're not getting what we bargained for. A $0.40 on the dollar over a four-year period of time. They also bargain for a payment, a contingent payment, based on 50 percent of the annual net operating profit before depreciation. And that would be impossible. If DelFasco came in and bought this company, there's no way they would be able to receive that benefit that they bargained for in this Chapter 11 process. Your Honors, I point out that in this case, the bankruptcy court did not modify any terms of the plan. The bankruptcy court did not apply any provisions of the bankruptcy code. The bankruptcy court simply interpreted the plan that it presided over for two years prior to confirmation and the plan that it actually confirmed. So do you think we should look at strings of evidence here, including the deliberations and what happened during the couple years before the confirmation? Well, I think the bankruptcy court, Your Honor, in interpreting this plan, took all that information into account. One of the facts that the bankruptcy court was clearly aware of, and she so stated in her opinion, was that if DelFasco was successful in its attempts to purchase the equity interest of the debtor before completion of the repayment terms of the amended plan, General Dynamics, the debtor's largest customer, and the Department of Army would cease doing business. And if that occurred, the company would no longer exist. What's your response to the point that the General Dynamics contract ended in 2015? Well, there was more than one contract with General Dynamics. The large contract that we had with General Dynamics did expire. We still do work for General Dynamics. That's who we do work for. This company makes casings for bombs, so our contracts are with the U.S. government and General Dynamics, who has contracts with the U.S. government. That's primarily who we do business with. How's the company doing? Well, the company is doing okay. The company would be doing a lot better if it wasn't having to fight litigation for the past two years. That's made a very detrimental effect on this company. We're talking about our primary competitor who has been trying to purchase for more than four years, but certainly in the four-year time that this company has been in bankruptcy and out of bankruptcy, that has had a very detrimental effect. We've been in federal court. We've been in bankruptcy court. We've been in appeals. We're now here. This is a continuous process where this company has tried to— I think we got that angle. Okay. I'm going to relinquish the rest of my time. Thank you. You're on. Good morning, Your Honors. May it please the Court, Counsel. I'm Jim Irving for the Oversight Committee, the successor in interest to the Official Committee of Unsecured Creditors that was in operation during the Chapter 11 portion of the case and that has been charged with ensuring the enforcement of the plan and that creditors receive the benefit of their bargain in the Chapter 11 case. As you saw in the committee's brief, we agree with the CONCO, the debtor's positions on many of the facts and many of the legal arguments. But what I'd like to focus on this morning is the standard of review, which I think is the path of least resistance for judicial determination. This is an issue which has been well briefed. There are numerous decisions within the Sixth Circuit. Terex, which Mr. Kaplan just mentioned, the Dow Corning Chapter 11 case, the Dow Corning Settlement Trust case in 2010, which Your Honor was a member of the panel on, and it's an area where there are numerous lower court decisions and decisions outside the circuit. And the basic rule is that on an appeal as set forth under LTV, this court looks at the bankruptcy court's decision primarily. I'm sorry. I think I at least understand these standard of review issues. It's a lot easier to know how to apply the standard of review when you understand the contracts. I'm still struggling with that one. But where would you point to the contract that says you can't make this – the four corners of this contract work and allow this sale? There's no sentence in the contract which says specifically that equity interest can't be divested. It's not there. So why isn't – what's funny is what's animating the bankruptcy court is the concerns of your clients. Yes. And you could have dealt with that another way by saying, all right, fine, entertain the sale. If you accept it, you accept it. But I'm going to make sure the creditors get paid. And that's how that problem is solved, in other words. It's funny to use that concern to alter the meaning of the contract when there's another way to serve that interest. I don't think it's altering the meaning of the contract. I'll address that. Well, forget whether it is or not. Why isn't that the way to protect your clients? Or why isn't that the certitude that it will all work out for them? There are two concerns. One is the benefit of the bargain. What are the damages if the company changes ownership or management? We believe that the bargain is, and I think that the plan read holistically, especially in the context, is that CONCA will be managed and owned by its existing equity interests. If you look at Section 8.01, the plan, it says specifically, Mr. Everson will remain in control. The company will operate. If Delfasco, which is the primary competitor, which purchased a nominal claim in order to gain standing, to be before your honor and be involved, if their interest is paid. Purchased a nominal creditor's claim? Is that what you mean by that? That's why they have standing. I get it, yeah, right. I mean, they're not a creditor. They're here as a competitor that bought a claim. They bought it from a creditor, though? Yes. Who did they buy it from? Okay, I got it. They bought it from a creditor. Okay, great. The issue, your honor, is if they took it over and they shut it down, the creditors would then have a breach of contract claim, is what they said, against a liquidated entity whose assets are all leaned up by a bank? Why isn't it a claim against Delfasco at that point? Delfasco was interfering with the rights of the claim. If it was a contract, you would try a breach of fiduciary duty claim. Right, that sounds pretty good. I think that it has some appeal. If that's what happens, I'm sure that's where we will be. But I think that it is faster, and this goes back to what's going to get creditors their recovery the fastest. It's faster to go to the bankruptcy court, which specifically retained jurisdiction, and it's much easier to prevent a harm and not have to worry about damages than to have the harm occur. And the harm is either Delfasco would shutter the operation, which we think that there's support for in the record, or General Dynamics could drop them. One thing I don't quite understand about this, and this must just be about the four years that preceded this, but if I were in your shoes, I'd still want to hear what they have to say. I mean, maybe they're going to give you something that completely guarantees your creditors are going to be taken care of. Why wouldn't you want to hear it, I guess, is my point. There were efforts to hear it during the 11th. In fact, the committee at one point worked with Delfasco on supporting a plan, but there was never any there there. It was too vague. There was an inability to get to a resolution. What the committee and the creditors that voted in support of this plan liked was there's defined distribution and a contingent distribution. In essence, we are a member of the JV for the term of this plan, the creditors and the debtors, and their equity interest owners, and the ESOP, the employees, working together in this joint venture that we've agreed to. When you look at the four corners of the plan, the hotly debated topic in the 11th and what Judge Lloyd used her abusive discretion standard, breathing life into the plan, taking a look at everything that had happened, it's about the financial projections, the oversight committee existing so that it can look at the projections and see if the debtor is exceeding projections, what the contingent distribution, the upside to the creditors, is going to be. All of that would be jeopardized by a change in control, and none of that's contemplated in the plan. Instead, what you have are numerous points which are suggesting... You remind me of the things that are hints of no change in control. One is you've said the person who was going to keep running it. Correct. Anything else? The projections themselves. The projections are predicated upon existing management, the company staying as it is. M&A activity, dissolution, other things would make the projections not make sense one way or another. The projections are based upon the debtor operating as it is under its contracts but with its existing customer base. Do you agree with your co-counsel in terms of other ways in which you could have a third-party sale, that the only way to do it would be a side agreement with an agreement for a prepackaged Chapter 11? A Chapter 22 with a prepack would be the way to do it. If someone comes with enough money to pay everyone off, that's something that could be done. It's a contractual hoop to jump through. What's not appropriate is a party, a competitor, that bought nominal standing, which fought tooth and nail with the debtor for years in the 11, which was an unsuccessful buyer, which was on its way to losing a confirmation fight, withdrew its objection to confirmation, and then months later makes a new offer with the interested parties who had equity interests but they did not have the right to vote in the plan because only the impaired creditors. They were at the bottom. They just received notice. They couldn't have objected. That begs the question. They may have been really clever. They realized the plan was silent on this. I don't know what to say about that. They've just been hanging out, realized, oh, I think here's what we'll do. Your Honor, the point that comes back to me is everything that we've discussed today and what's in the briefs, it's all talking about what happened in the bankruptcy case. What's the context? What's the language? How should this be interpreted in light of this? This is more than just contract interpretation, which could arguably be de novo. Right now we're getting into how is the contract read together, the different provisions, how do they fit with the bankruptcy case, and that's where we get back to the abuse of discretion standard. All right. Thank you. I think we've got some rebuttal. Mr. Skolnick. Thank you, Your Honor. A few points to hit on rebuttal. The first one is most of this argument has talked about Del Fasco. Most of this argument has spoken about what happened pre-confirmation and hypotheticals about what could occur if there was a purchase offer. Your Honor, we would respectfully submit that the analysis should begin and end with the plan itself. And the plan itself is very clear. We don't believe it's silent. It addresses directly the question of alienation, and it has only one limit on that alienation, and that's a purchase by the creditor itself. I mean, that's an implication, and there are implications from keeping the same control of the company, same management. That's another implication. Your Honor, change of control provisions are quite frequently put into contracts, and it strikes me that what we're trying to do is to twist ourselves to a way where we can find that the plan prohibits a change of control. The plan could have said that it prohibits a change of control. It doesn't. The plan could have said that it prohibits a sale to a third party other than a creditor or other than the debtor. What's it mean when it says the same fellow is going to be running the company? What's that mean? Your Honor, that comes in under Section, I believe it's 1123, that requires a good faith implementation plan, where you have to state how in good faith you're going to try to run the company. And included in that is another requirement that says if interested parties or former employees are going to continue, you need to list them by name. So you're required to provide that information. But if Mr. Everson wanted to retire next year or this year, that wouldn't mean that the company wouldn't continue to run or the plan wouldn't continue to go. By the same virtue, Your Honor, under the contingent. You know, if the payout schedule to the creditors were over ten years, I would really have a lot, I really think that would support you. But doesn't it hurt you that it's such a short time frame? It really does suggest this is, you know, because normally equity holders get nothing. They're toast. And here you're going to have this payout, and then they're going to have the company. I mean, it's a very tight timetable. Your Honor, again, respectfully, I think we're conflating two questions. We're conflating who owns the company with what happens to the company. There's nothing in the record that shows that if DelFasco or anyone else, and we have to remember, this isn't a case about DelFasco. It's a legal question as to whether or not the plan prohibits a sale generally. But there's nothing that says that if someone purchases the equity, that the company wouldn't continue to run.  One of the offers that has been made by DelFasco along the way was to pledge that it would continue to run. So is the plan silent, or is there an ambiguity with respect to that issue? Your Honor, we would say it's neither silent nor ambiguous. And that's because there's a statement that says, on the effective date, holders of equity security shall retain their interests. That's saying rather than have their shares extinguished, they're going to have them on the effective date, and they're going to be as an existence immediately prior. Well, immediately prior, they could have sold the shares, Your Honor. And so that language read on its plain terms means that if the day before confirmation they could have sold them, they're going to keep their shares on the day of confirmation, but they still have their interests. That would violate, though, the established priority in the code for them to take that position, wouldn't it? No, Your Honor, it wouldn't violate it at all because this was a consensual plan where they moved from system to system. But that's the starting bargaining position. It's a starting bargaining background principle. Well, Your Honor, every version of this plan had similar language to this. And as the plan moved along, the only question of a sale was a sale of assets, not a sale of equity. There was never an offer or a contemplation of a sale of equity pre-confirmation. And there's just very simply a difference between purchasing assets and purchasing ownership. If you purchase ownership, you stand in the shoes of the person that you've purchased it for. And to answer Your Honor's question, and I'll end here, yes, if Delfasco purchases this company, it would make the defined distributions as required under the contract. It would be required to do so as a matter of contract. When I think of confirmation plans, I'm supposed to think of them as contracts. And as a general matter, aren't I usually thinking of them as mainly contracts between the debtor and the creditors? Not in this case, Your Honor, no. I said general. You knew where I was heading, so I'll complete the point, and then you'll answer it. It's usually between those. Those are the two elephants in the room. Those are the two big players. They both think this was not contemplated. It's just very funny. I mean, it's usually in ten cases and contracts, one party says A. The other says opposite A. Here the two parties say A, A, A. And this other party says no, no, no. Isn't there some intuition to that point? I don't believe so, Your Honor. And I think one point is that they have argued in front of Judge McKinley that a sale from GE could be something that would be contemplated. So we would argue that there may be some – No, that was clarified. I think their position is principled, that it would require a new plan. That's what I heard them say. I would suggest it was not as clear in front of Judge McKinley, but I'll take Mr. Bordy at his word here today. But the second point to that, Your Honor, is that it's not just a contract for them. Delfasco was a creditor. If Delfasco believed there was no – Well, well, well, they were not a big creditor, right? They weren't a big creditor. They're an opponent. They're a competitor. That doesn't determine your legal rights, Your Honor. No, I got that. Also, the independent trustee who represented the ESOP, that individual might have spoken up. My point, Your Honor, is there's a whole hypothetical set of negotiation and things that could have occurred, had this been in the plan, had it been clear, that could have been discussed, and we can't go back and assume that we would have ended up with a plan that either would have had the absolute priority rule or would have had a clear prohibition on the right of alienation because we can't go back and redo that. There was nothing in the disclosure statement that said you can't sell to a third party, and we would argue there's nothing in the plan that says that either. Quite the contrary. It makes a specific discussion of alienation, and it only limits sale to one person. You did say that there were prior offers that were going to take care of the creditors. One thing I know about bankruptcy for sure is everything's negotiable, and we won't do anything for a week or two. If you guys can figure it out, figure it out. After that, at least two of us will do something, maybe all three. All right. Thanks to all of you for your very helpful briefs, for the oral arguments. It's a complicated case, so thank you for trying to make it explainable to us, which we very much appreciate. The case can be submitted, and the clerk may adjourn court.